INHABITANTS OF CUMBERLAND COUNTY

*vs.*

CENTRAL WHARF STEAM TOW-BOAT COMPANY.

Sagadahoc.   Opinion March 8, 1897.

*Negligence.   Tow-Boat.   Proximate Cause.   Abatement.*

The owner of a tow-boat towing a vessel, whether astern by a hawser or lashed alongside, is, as to third parties, the active, directing and responsible agent controlling the movements of the vessel it is undertaking to tow.

A third party injured through the fault of the master of such tow-boat may recover of the owner therefor, even though those upon the vessel being towed were also in fault.

The pendency of an action against the owner of the vessel for such fault does not bar, nor abate, an action against the owner of the tow-boat for the fault of the latter.

The fact that the owner of a bridge across tide water has not in all respects complied with the requirements of the license granted him to build and maintain such bridge will not prevent his recovering damages for an injury thereto, if it appears that such omission was not one of the real and proximate causes of the injury.

A verdict will not be set aside when it does not appear to the court that upon the issues of fact raised it is unmistakably wrong.

ON MOTION AND EXCEPTIONS BY DEFENDANT.

This was an action brought by the plaintiffs against the Central Wharf Steam Tow-Boat Company for injuries to Portland Bridge,

caused by the three-masted schooner "Viator" striking the western corner of the bridge seat on the forenoon of November 1, 1895, while in tow of the defendant's steam tug "Salem."

The day. following the accident the county commenced an action against the owners of the schooner, which is now pending in the Supreme Judicial Court for Sagadahoc county. On the 15th day of the same month the present action. was brought against the defendant for the same injury.

This case was tried at the December term in Sagadahoc county, and a verdict rendered for the plaintiff for the full cost of restoring the bridge,—the suit against the owners of the schooner still pending.

The defendant filed a motion to have the verdict set aside as against the evidence, and also filed exceptions to the rulings of the presiding justice.

The case is stated in the opinion.

*Chas. A. True* and *Richard Webb*, for plaintiff.

*Benj. Thompson*, for defendant.

Counsel cited: *John C. Sweeney*, 55 F. R. 536; *The Express*, Olcott, 258; *The Doris Eckhoff*, 32 F. R. 555, 557; *Penn. Ry. Co.* v. *Baltimore & N. Y. Ry. Co.*, 37 F. R. 129, 130; *Texarkano & F. S. Ry.* v. *Parsons*, 74 F. R. 408; *Missouri River Packet Co.* v. *Hannibal & St. Jo. R. Co.*, 2 F. R. 285, 290; *Atlee* v. *Pack. Co.*, 21 Wall. 389, 395; *Assantee* v. *Charleston Bridge Co.*, 41 F. R. 365; *Garey* v. *Ellis*, 1 Cush. 306, 307;. *Silver* v. *Mo. Pac. Ry. Co.*, 13 S. W. 410, 412; *Dyer* v. *Depui*, 5 Whar. (Penn.) 583, 596; *Corthell* v. *Holmes*, 87 Maine, 24, 27; *Brown* v. *Perkins*, 12 Gray, 89, 101; *Arundel* v. *McCulloch*, 10 Mass. 70, 71; *State* v. *Anthoine*, 40 Maine, 435; *Dyer* v. *Curtis*, 72 Maine, 181, 186.

SITTING: WALTON, EMERY, HASKELL, WISWELL, STROUT, JJ.

EMERY, J. The undisputed facts are these:—The Schooner "Viator" was lying at the Eastern Railroad dock in Portland Harbor, up Fore River above the second bridge. She was in

charge of the mate, but had a full crew on board. The defendant company, a corporation engaged in the business of towing vessels for hire, sent one of its servants Capt. Howe in the steam tug "Warren," accompanied by the steam tug "Salem," to tow the "Viator" from its dock down through the bridges to the outer harbor, preparatory to her going to sea. Arriving at the dock, the "Warren" made fast to the schooner's starboard quarter, while the "Salem" took a line from her starboard bow. The two tugs thus towed the schooner off from the pier and took her down to the upper or railroad bridge. The draw of this upper bridge being too narrow for the tug and schooner to pass through abreast, the "Warren" cast off and fell behind while the "Salem" went on ahead towing the schooner behind with a twenty-fathom hawser. After passing through the upper draw in this manner, the draw of the lower bridge, the Portland bridge, was in plain sight about 1700 feet distant. The "Salem" after a momentary stop kept on towing the schooner by the hawser, while the "Warren" followed behind the schooner, but disconnected. The wind was blowing rather across the river from the Portland or left hand side.

As they thus approached the Portland Bridge draw, Capt. Griffin of the "Salem" called back to the schooner that he would go through the Portland side of the centre pier of the draw and for the schooner to follow him. Capt. Howe of the "Warren," then astern, called out for the schooner to keep up to the windward, i. e. toward the Portland shore. To do this required a somewhat starboard helm. The "Salem" passed midway through the draw all right, but when very near the draw the helm of the schooner was put farther to starboard and she suddenly sheered to port in toward the abutment on the Portland side.

When this sheer was seen orders were at once shouted from the tugs for the schooner to put her helm to port, but before these orders could take effect she struck the abutment of the bridge on that side with her port bow, inflicting damage to the bridge.

There was some contention as to whether the manner of towing through the draw (i. e. by the "Salem" going ahead and towing with a twenty-fathom hawser, while the "Warren" cast off and

merely followed behind) was decided upon by the master of the schooner or the master of the tugs. This question we think is practically immaterial, as will appear further on.

The real cause of the starboard helm of the schooner and her consequent sudden sheer to port at the critical moment of entering the draw was also much in dispute. This question is essentially material, for unless this cause was in some fault of the defendant's servant, the master of the tugs, the defendant cannot be held liable, since no other sufficient ground appears in the evidence. The plaintiff contended, and there was evidence tending to show, that this movement of the helm and consequent sheer of the schooner was in obedience to orders from Capt. Howe of the " Warren " who was in charge of the operation. The defendant contended, and there was evidence tending to show, that no such orders were given from the tugs and that if the helmsman had any such order it came solely from those on the schooner. Whatever be our own belief, the jury have found for the plaintiff on this issue and we are constrained to say that their finding is not so unmistakably wrong as to justify us in disregarding it. Captain Howe admittedly gave a general direction to the schooner to keep to windward, and hence it is not very improbable that he may have enforced this general direction by a special one of the same tenor. It must be assumed, therefore, that Capt. Howe of the " Warren " did give the order which brought about the disaster. The jury further found that the giving such an order at that time under those circumstances was a negligent act, and hence an actual fault on the part of the defendant. This finding also must be assumed to be correct.

The legal propositions applicable to the above state of facts can be briefly stated.

I. The defendant company was engaged in a regular, well-known, distinctive business—in a recognized separate branch of the business of navigation—the towing of sailing vessels from sea to dock and from dock to sea, and from place to place and in rivers and harbors. In such towing it was, as to third parties, the active,

directing agent controlling the movements of the vessel it was undertaking to tow. As such active agent it was liable to third parties for any injury caused them by its negligence in managing a tow. *Sproul* v. *Hemmingway*, 14 Pick. 1; *N. Y. & B. Trans. Co.* v. *Phila. & Savannah S. Co.*, 22 How. 461. That it adopted suggestions from the vessel in tow would not relieve it from liability to third parties.

The fact that those upon the sailing vessel were also in fault in managing the vessel, and by their fault contributed to such injury to third parties, does not exempt the defendant, the owner of the tugs. The third party thus injured can recover compensation from either the vessel or the tug, if each has been guilty of a fault causing the injury. The fact that the plaintiff has a separate suit pending against the owners of the schooner "Viator" for the same injury, in which suit the fault of the vessel is alleged as the cause of the injury, does not bar this suit against the owner of the tug. *The Mabey and The Cooper*, 14 Wall 204; *The Atlas*, 93 U. S. 303; *The Civilta* v. *Perry*, 103 U. S. 599; *Lake* v. *Milliken*, 62 Maine, 240.

Applying these principles to this case, if the plaintiff was not also guilty of a contributing fault, it is clearly entitled to recover of the tow-boat company by reason of the proven fault of the latter in misdirecting the helm of the schooner.

II. The defendant, however, insists that the plaintiff was guilty of a contributing fault in that it did not provide in its bridge a draw of the full width of seventy feet from pier to abutment. There was evidence tending to show that the plaintiff's authority to build or, at least, maintain this bridge across tidewater was accompanied by the requirement that the width of the draw between pier and abutment should be full seventy feet. There was also evidence tending to show, that at the time of the accident at least, the actual width was from fifteen to twenty inches less than seventy feet. As the contention of the defendant and the rulings of the presiding justice were based on this evidence we must for the present assume its truth.

The defendant contended that this failure to comply with the requirements and conditions of the authority given the plaintiff to maintain this bridge left the bridge an illegal structure as to the defendant, so that no action could be maintained for the defendant's injury to it. The defendant further contended that if the main part of the bridge was not an illegal structure, such part of it as was within the seventy feet limit was illegal and without legal protection, and if such part contributed to the collision the plaintiff could not recover. Upon these points, the presiding justice instructed the jury that upon the evidence as to the width of the draw there was "an unlawful obstruction, but that would not necessarily deprive the plaintiff of his right to recover as against a stranger who had inflicted this damage, if it appeared that this mere variation from the seventy feet was not one of the real and proximate causes of the injury." Under this instruction the jury must have found that the variation in the width of the draw from the required seventy feet down to sixty-eight feet and some inches was not one of the real and proximate causes of the injury.

The instruction was in accordance with the principle stated by the United States Circuit Court in *Missouri River Packet Co.* v. *Hannibal & St. Joseph R. R. Co.*, 2 Fed. Rep. 285. In that case the defendant was authorized to maintain a railroad bridge across the Missouri River but with a clear distance of one hundred and sixty feet between piers. The actual distance between the piers was a few feet less than one hundred and sixty feet. The plaintiff's boat, while passing under the bridge, was driven by the current against one of the piers and was damaged. The plaintiff contended that the mere fact of the distance between the piers being less than the required one hundred and sixty feet rendered the bridge an unlawful structure, and deprived its owner of any defense against the consequences of such a collision. The jury however were instructed as follows: "Though you may find from the testimony that the width between the piers as constructed is less than the act of Congress requires, yet this violation of the law by the defendant in this construction of its bridge is not available to the plaintiff in recovering damages, unless it caused or contributed to the injury by the plaintiff complained of."

A motion for a new trial was heard before the full circuit bench, which declared through McCrary, Circuit Judge, that the above instruction stated the true rule upon the subject. In *Dimes* v. *Petley*, 15 Q. B. 276, the owner of a wharf claimed damages, as here, from the owner of a vessel for his negligence in running his vessel against the wharf. The defendant claimed, as here, that the wharf as against him was an illegal structure. It was held by the court that the offered defense was not sufficient,—that he would still be liable if by the exercise of reasonable care and with reasonable convenience, he could have avoided the collision.

The principle is also exemplified in *Damon* v. *Scituate*, 119 Mass. 67, where it was held that the mere fact that the plaintiff was traveling on the wrong side of the road in violation of the statute did not defeat his action for injuries from a collision with the defendant's team, if that fault did not contribute to the injury. So in *Steele* v. *Burkhardt*, 104 Mass. 59, it appeared that plaintiff, a drayman, had backed his team against the curb and across the street, in violation of the city ordinance, and was thus illegally partially obstructing the street. The defendant, in driving past on the other side, ran his wagon over the fore feet of the plaintiff's horse. It was held that the mere fact that the plaintiff's team at the time was an unlawful obstruction did not bar the plaintiff's action, if that circumstance did not contribute to the injury.

When carefully studied, the cases cited by the defendant (except perhaps the case cited from 79 Missouri, 478,) will be found not to conflict with the principle as applied here by the presiding justice. They mainly go to the conceded proposition that a plaintiff cannot recover damages for a disaster that his own illegal or wrongful conduct helped bring about.

The exception to this instruction must be overruled. The other exceptions upon the same subject matter naturally fall with this one, including that in relation to damages. That part of the bridge within the required space of seventy feet was the plaintiff's property. The jury have found that it did the defendant no harm and was not a factor in the legal cause of the disaster. Hence it is not without the pale of the law.

III.   The request for a ruling that the " dolphins " at the ends of the draw pier tended to justify the mode of towing by hawser is not urged in argument.   The question seems to have become immaterial.

*Motion and exceptions overruled.*